1

2

3

4

5

6

7

8

9

10

11

12                    IN THE UNITED STATES DISTRICT COURT

13                      FOR THE DISTRICT OF OREGON

14                          PORTLAND DIVISION

15   GEORGE E. DUNN,                    )
                                        )
16                  Plaintiff,          )
                                        )       No.  CV-10-6090-HU
17        v.                            )
                                        )
18   COMMISSIONER of Social             )
     Security,                          )       FINDINGS & RECOMMENDATION
19                                      )
                    Defendant.          )
20   _____)

21

22   Drew L. Johnson
     Drew L. Johnson, P.C.
     1700 Valley River Drive
23   Eugene, OR 97405

24   Kathryn Tassinari
     Harder, Well, Baron & Manning, P.C.
25   474 Willamette, Suite 200
     Eugene, OR 9701
26
         Attorneys for Plaintiff
27
     Dwight C. Holton
28   UNITED STATES ATTORNEY

     1 - FINDINGS & RECOMMENDATION

District of Oregon
Adrian L. Brown
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2904

Jordan D. Goddard
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104-7075

    Attorneys for Defendant

HUBEL, Magistrate Judge:

    Plaintiff George Dunn brings this action for judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and Supplemental Security Income (SSI).  This Court has jurisdiction under 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)).  For the reasons below, I recommend that the Commissioner's decision be affirmed.

PROCEDURAL BACKGROUND

    Plaintiff protectively filed for SSI and DIB on May 5, 2008, alleging an onset date of February 4, 2008.  Tr. 10, 105-11, 112-16.  His applications were denied initially and on reconsideration.  Tr. 64-73, 77-83.  On September 30, 2009, plaintiff appeared for a hearing before an Administrative Law Judge (ALJ).  Tr. 21-59.  On November 27, 2009, the ALJ found plaintiff not disabled.  Tr. 7-19.  On February 3, 2010, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the agency's final decision.  Tr. 1-3.

FACTUAL BACKGROUND

    Plaintiff alleges disability based on hepatitis C, diabetes, vision problems, and illiteracy.  Tr. 124.  At the time of the

2 - FINDINGS & RECOMMENDATION

hearing, plaintiff was 48 years old.[1]  Tr. 26, 105.  Plaintiff has a high school diploma.  Tr. 17, 26, 129.  He has past relevant work as a meat cutter apprentice and as a janitor.  Tr. 17.

I.  Medical Evidence

The medical evidence begins with plaintiff's initial visit to Dr. Erik Long, M.D., on January 12, 2006.  Tr. 210-11.  At that time, plaintiff reported that the he suffered from acid reflex, depression, and hepatitis C.  Id.  Dr. Long noted that plaintiff seemed alert, oriented, and was generally very pleasant.  Id. Plaintiff did not present with any vegetative signs of depression and there was no evidence of pressured speech.  Id.  Dr. Long diagnosed plaintiff with acid reflux disorder, depression, diabetes mellitus, and chronic hepatitis C.  Id.  Plaintiff was provided medication samples for his acid reflux and depression and  written a prescription for Glyburide to help with the "poorly controlled" diabetes.  Id.  With regard to the hepatitis, Dr. Long noted that he "was not sure if this is chronic," but he took a blood sample to determine viral load, with an expected follow-up referral to a gastroenterologist.  Id.

At a follow-up visit on February 10, 2006, Dr. Long noted that plaintiff's depression was stable and he appeared to be "pleasant," "presentable," had cut his hair, was working, reported sleeping well, and was interested in furthering his medical care.  Tr. 207. Dr. Long noted that the Lexapro seemed to be "working very well" to

[1]  The ALJ's opinion notes that plaintiff was 46 years old at the time of the hearing.  Tr. 17.  Plaintiff does not challenge that the ALJ erred by mis-stating his age.  Thus, the court considers this a typographical mistake amounting to harmless error.

3 - FINDINGS & RECOMMENDATION

control plaintiff's depression. Id.

On August 2, 2006, plaintiff reported to the emergency room complaining of pressure in his left eye, tenderness behind his left ear, abdominal pain, nausea, and vomiting. Tr. 191. Plaintiff mentioned his earlier diagnosis of hepatitis C, for which he said he received some treatment, but "could not finish because of inadequate funding." Id. He admitted a history of intravenous drug use, but stated he had been clean for three years. Id. He was released in stable condition after being prescribed a Z-PAK (Azithromycin) and Vicodin for pain. Tr. 192.

On November 27, 2007, plaintiff presented to the emergency room for complaints of sudden lower back pain increased with movement. Tr. 186. He was diagnosed with acute musculoskeletal low back strain, treated with an IV and pain medication, and discharged in stable condition. Tr. 187.

The next day, on November 28, 2007, plaintiff was examined by Gail Cook, a physician's assistant in Dr. Long's office, regarding his chronic medical conditions. Tr. 202. Id. Plaintiff reported a history of gastroesophageal reflux disease, depression, hepatitis C,[2] and diabetes. Id. He had been previously referred to a gastroenterologist, but had been notified that hepatitis was a recurrent condition and may not be covered by insurance. Id. PA Cook noted that plaintiff was an "obese, chronically ill appearing male," but was in no acute distress. Id. Plaintiff ambulated

---

[2] This treatment note alternates between referencing hepatitis B and hepatitis C. There is no other indication in the record that plaintiff suffers from hepatitis B, so the court construes these notes as intending to refer to hepatitis C.

4 - FINDINGS & RECOMMENDATION

poorly and acted as though he was in pain, but by the time he left, he appeared much better. Id. She noted that his diabetes and hypertension were not under good control, continued the Nexium prescription for gastroesophageal reflux, gave him a shot of Toradol for back pain, put him on Lovastatin for dyslipidemia, and encouraged him to look into his insurance options regarding hepatitis treatment. Id.

On February 14, 2008, plaintiff was examined by Benjamin W. Attebury, a physician's assistant in Dr. Long's office. Tr. 200. Plaintiff reported increased anxiety, mood swings, and increased depression. Id. Depression was his main concern, though he also mentioned his history of hepatitis C. Id. PA Attebury started him on fluoxetine (Prozac) for his depression, with follow-up in four to six weeks. Id. Plaintiff's diabetes and hypertension were uncontrolled, and PA Attebury expressed a need for a liver function test to make sure his enzymes were not elevated because of his hepatitis C infection in connection with taking Lovastatin. Id.

On April 7, 2008, plaintiff was seen by Cameron Clark, a physician's assistant in Dr. Long's office, to follow-up on his diabetes, gastroesophageal reflux disease, hypertension, and depression. Tr. 197. Plaintiff reported that he was losing weight, was very tired, weak, unmotivated, anxious and depressed. Tr. 198. He reported discoloration in his legs and feet as well as a burning sensation that felt like walking on needles. Tr. 197. He was not eating well and was stressed out about his work, health, and kids. Tr. 198. During physical examination, PA Clark observed several varicosities and enlarged veins in plaintiff's legs and minor discoloration for stasis dermatitis, but opined that

5 - FINDINGS & RECOMMENDATION

1  it was nothing to be concerned about.  Tr. 197.  Microfilament
2  testing on the bottom of his feet was reduced bilaterally.  Id.
3  Plaintiff was diagnosed with diabetic neuropathy and started on
4  amitriptyline.  Id.  With regard to plaintiff's depression, the
5  treatment note indicates that he started medication two months
6  prior, had noticed "some improvement" but still feels agitated and
7  anxious.  Id.  His Prozac dosage was increased from 20 to 40mg per
8  day, with follow-up in six weeks.  Id.  His diabetes and acid reflex
9  medications were adjusted.  Id.

10     On April 9, 2008, PA Attebury wrote a letter on plaintiff's
11 behalf, noting that he had seen plaintiff once as a patient and
12 that in his opinion, "he does have chronic medical conditions which
13 may prevent him from working."  Tr. 194.

14     In a field office disability report completed on May 16, 2008,
15 the interviewer observed that plaintiff had difficulty with reading
16 and writing, as evidenced by the fact that when he gave plaintiff
17 the application to review, plaintiff gave the application to his
18 wife.  Tr. 134-35.  The interviewer did not note any physical
19 limitations.  Id.

20     On May 27, 2008, plaintiff established care with Dr. John
21 Ward, M.D.  Tr. 241.  Plaintiff reported having lost 15-20 pounds
22 in the previous month, that he was experiencing ongoing nausea, leg
23 discomfort that felt like "pins and needles," and recurring
24 headaches that sometimes resulted in nausea, vomiting, and blurred
25 vision.  Id.  Dr. Ward noted plaintiff's difficulty keeping his
26 blood sugar controlled and his history of depression.  Id.  He
27 noted that while plaintiff "really has felt down about things," he
28 was "overall pleased with the fluoxetine."  Id.  On physical exam,

6 - FINDINGS & RECOMMENDATION

Dr. Ward noted that plaintiff was disheveled, had a flat affect, seemed "somewhat depressed," but was in no acute distress. Tr. 243. Dr. Ward found plaintiff's diabetes well controlled with medication, noted that plaintiff hadn't had follow-up blood work for his hepatitis C for some time, wrote a new Prilosec prescription for acid reflex, and increased his Prozac dosage because while the current dose was helpful, there was "more room to go to help with his ongoing depressive symptoms." Tr. 244.

Dr. Ward next saw plaintiff on June 12, 2008, to follow up on his blood work. Tr. 238. At that time, plaintiff reported that he had not noticed a change with the increased Prozac dose. Id. He was still feeling depressed and unmotivated. Id. Dr. Ward observed that plaintiff had a flat affect, seemed "somewhat depressed," but was in no acute distress. Tr. 239. The lab work revealed an ongoing, active hepatitis C infection, for which Dr. Ward explained that they needed to get other health issues taken care of before they could even consider pursuing treatment. Tr. 240. Dr. Ward added Wellbutrin to manage plaintiff's depression, discussed treatment options, and prescribed Lisinopril to help with ongoing high blood pressure. Id. Dr. Ward found plaintiff's diabetes well controlled and continued him on his current medication regime. Tr. 239.

On July 10, 2008, plaintiff reported elevated blood sugar and ongoing headaches with neck pain and stiffness. Tr. 234. He reported feeling angry and irritable, and did not notice much change in his mood after starting Wellbutrin. Id. Dr. Ward described his general appearance as "disheveled." Tr. 235. Dr. Ward administered an injection of Toradol for plaintiff's tension

7 - FINDINGS & RECOMMENDATION

headache, increased his diabetes medication, added Effexor for depression, and continued the pain medication prescriptions for plaintiff's complaints of ongoing lower extremity pain related to diabetic neuropathy.  Tr. 236.

On August 7, 2008, Dr. Ward again adjusted plaintiff's various medications, noting that his blood sugar and blood pressure were better controlled and that Effexor had improved his mood.  Tr. 230-31.  However, plaintiff was still experiencing recurrent headaches and leg pain.  Tr. 230.  Dr. Ward observed that plaintiff appeared disheveled, and he noted that he needed to "establish with mental health," especially in anticipation of beginning hepatitis C treatment. Tr. 231-32.

Plaintiff followed up with Dr. Ward on September 23, 2008, regarding his recent blood work.  Tr. 422-23.  At that time, he reported increased headaches, muscle aches, low back pain, and increasing abdominal pain.  Tr. 422.  Dr. Ward noted that plaintiff appeared disheveled, had a flat affect, and was somewhat depressed. Tr. 423.

On September 25, 2008, DDS physician Dorothy Anderson, Ph.D, completed a psychiatric review technique form, concluding that plaintiff suffered from depression that results in mild functional limitations in the areas of maintaining social functioning and maintaining concentration, persistence, or pace.  Tr. 254-67.  She observed that plaintiff's mental health is routinely treated by his primary care physician, and that he reports mood improvement with the use of mental health medication.  Tr. 266.  Because neither plaintiff, nor his primary care physician, listed mental health symptoms as a limiting factor to his ability to function, his

8 - FINDINGS & RECOMMENDATION

1   depression was non-severe. Id. On January 21, 2009, reviewing
2   physician Kordell N. Kennemer, Psy. D, affirmed this determination,
3   noting that while plaintiff has medically determinable impairments,
4   his activities of daily living do not indicate significant
5   psychological limitations because he can get along with others,
6   shop, play board games with his children, and could handle finances
7   if he had money. Tr. 305.

8       Also on September 25, 2008, DDS physician Dr. Neal E. Berner,
9   M.D., completed a physical RFC assessment, concluding that
10  plaintiff could occasionally lift and/or carry 20 pounds,
11  frequently lift and/or carry 10 pounds, stand and/or walk with
12  normal breaks for a total of about six hours in an eight-hour work
13  day, sit with normal breaks for six hours in an eight-hour work
14  day, and had unlimited push/pull limitations other than those
15  associated with the lift and/or carry weight restrictions. Tr.
16  268-75. Plaintiff should only occasionally climb a ladder, rope,
17  or scaffold, but could frequently climb a ramp or stairs, balance,
18  stoop, kneel, crouch, or crawl. Tr. 270. He has no manipulative,
19  visual, or communicative limitations, but due to sensory loss in
20  his feet, he should avoid even moderate exposure to hazardous
21  machinery. Tr. 271-72. Dr. Berner gave plaintiff's statements
22  full credibility. Tr. 273. Dr. Berner noted that plaintiff's
23  primary care physician is monitoring and treating his diabetes and
24  associated neuropathy with medication, that his headaches are
25  tension related, and that he retains the ability to ambulate
26  effectively, but does better with normal breaks. Tr. 275.
27  Ultimately, Dr. Berner concluded that plaintiff has the RFC to
28  perform light work with some postural and environmental

9 - FINDINGS & RECOMMENDATION

limitations. Id.  Upon review on January 23, 2009, Dr. Linda L. Jensen, M.D., affirmed the recommendation, but noted that she found plaintiff's allegations regarding the limiting effects of his impairments only partially credible.  Tr. 306.

A CT-scan of plaintiff's abdomen taken on October 3, 2008, revealed degenerative changes in the lumbar spine at L4-5 and L5-S1, a few scattered non-enlarged retro peritoneal, periaortic, and pericaval lymph nodes, but no free fluid or mesenteric inflammatory changes were observed in his abdomen or pelvis.  Tr. 324-25.

On October 6, 2008, plaintiff complained of fever, loss of appetite, fatigue, cough, shortness of breath, wheezing, chest congestion, increased nausea, and sore throat.  Tr. 294.  He also reported that he was experiencing severe headaches accompanied by photophobia and phonophobia.  Id.  Dr. Ward diagnosed plaintiff with pneumonia, generalized abdominal pain, and headache.  Tr. 295. After reviewing the recent lab work and CT scan to determine a cause for the abdominal pain, Dr. Ward noted that he found them "unrevealing" and instead decided to treat plaintiff's more acute issues, namely his pneumonia and headache.  Id.

Three days later, on October 9, 2008, plaintiff followed up with Dr. Ward for his pneumonia, abdominal pain, and shortness of breath.  Tr. 291-93.  At that time, plaintiff reported feeling overall much better, but he was still experiencing abdominal pain. Id. His cough had decreased, his headache had improved, and he was breathing more easily with the help of an albuterol inhaler.  Tr. 291.  Dr. Ward noted that plaintiff was mildly ill appearing, but appeared better than the previous visit, and despite "running pretty warm," he had no measured fever.  Id.  Dr. Ward again

reviewed the recent CT scan, but did not find a clear cause for plaintiff's abdominal pain, so he recommended follow-up in two weeks. Tr. 292.

On November 14, 2008, plaintiff was seen by Dr. Ward for recurrent night sweats, arm and face tingling, fever, fatigue, and blurred vision. Tr. 412. Dr. Ward observed that he was mildly ill appearing, had a flat affect, and seemed somewhat depressed. Tr. 413. Dr. Ward opined that the night sweats might be a side effect of Prozac, but deferred recommendations until the return of a chest x-ray and additional blood work. Tr. 413. Dr. Ward still could not find a clear cause for plaintiff's ongoing abdominal pain, and deferred further recommendations regarding plaintiff's shortness of breath until the blood work returned. Tr. 413-14. Chest x-rays taken that day revealed cardiomegaly without evidence of congestive failure and low lung volumes. Tr. 402.

In a brief treatment note dated November 17, 2008, Dr. Ward noted plaintiff's chest x-ray did not show a clear cause for his night sweats and the blood work showed that his liver function was chronically elevated. Tr. 287. He recommended that plaintiff follow-up if his symptoms continued. Tr. 287.

During a visit on November 24, 2008, Dr. Ward noted that plaintiff was "mildly ill appearing," was experiencing chills, fevers, cough, recurrent arm pain, and general fatigue. Tr. 282-83. Dr. Ward observed that plaintiff was not completely improved from his recent bout with pneumonia so he prescribed Prednisone and another course of Azithromycin. Tr. 283. He continued his medications for his chronic neck pain and diabetes, and ordered an echocardiogram. Tr. 283-84. Finally, Dr. Ward reviewed the most

11 - FINDINGS & RECOMMENDATION

1  recent laboratory results, noting that plaintiff has an ongoing
2  active hepatic C infection.   Tr. 284.   There was no mention of
3  depression. Tr. 282-84.

4      An echocardiogram taken the next day on November 25, 2009,
5  revealed stage one diastolic dysfunction, but no other abnormalities
6  or evidence of an enlarged heart.   Tr. 313, 399.

7      On December 15, 2008, plaintiff complained of nausea, vomiting,
8  stomach pain, and general lethargy that had been ongoing for the
9  past few weeks.   Tr. 319.   He was also feeling short of breath and
10 was experiencing increased low back pain, with tingling in the upper
11 thigh area.   Id.   Dr. Ward noted that he would refer plaintiff to
12 Dr. Csanky for further evaluation of his abdominal pain since no
13 clear cause could be established.   Tr. 320-21.   Despite the recent
14 CT scan's revelation of degenerative changes in the lumbar spine at
15 L4-5 and L5-S1, Dr. Ward noted that he anticipated slow improvement
16 in plaintiff's back pain symptoms.   Id.

17     At the request of Dr. Ward, plaintiff was seen by Judith E.
18 Csanky, M.D., on December 16, 2008, for ongoing diarrhea and
19 abdominal pain.   Tr. 326-28.   After conducting a physical
20 examination and reviewing recent diagnostic tests, Dr. Csanky
21 deferred recommendations until she performed several endoscopic
22 procedures.   Tr. 328.

23     On January 7, 2009, plaintiff underwent an upper and lower
24 endoscopy and colonoscopy. Tr. 329-332.   Dr. Csanky noted that the
25 examination was limited due to plaintiff's failure to properly prep
26 his bowels because he did not drink most of the prep solution.   Tr.
27 331-32. Consequently, Dr. Csanky recommended that plaintiff undergo
28 a repeat colonoscopy in six months, and in the meantime, continue

taking Prilosec once daily, with the possibility of increasing to twice daily, and taking Gaviscon as needed for symptom relief.  Tr. 331.  An examination of the tissues revealed benign duodenal mucosa with no specific abnormalities, mild acute colitis, and benign gastric fundal and gastric antral mucosa with minimally active mild chronic gastritis with no atrophy and no helicobacter organisms identified.  Tr. 397-98.

On July 14, 2009, plaintiff presented to the emergency room after losing his balance and injuring his left elbow.  Tr. 334-39, 369-70.  An x-ray revealed no acute bony injury, and he was discharged with pain medication and instructions to follow-up with his primary care physician.  Tr. 338.

Plaintiff saw Dr. Ward again on September 3, 2009, at which time plaintiff complained of recurrent chest pains and reported that his medications were not as effective  as they had been in the past. Tr. 389.  He expressed an interest in trying insulin to more effectively control his blood sugars.  Id.  Dr. Ward noted that plaintiff was "mildly ill appearing" on physical examination.  Id. Dr. Ward started plaintiff on insulin and made a referral to diabetic educators, with follow-up in two weeks.  Tr. 390. Regarding plaintiff's complaint of chest pains, Dr. Ward noted that the most recent EKG was normal, gave plaintiff some nitrogylcerine, which seemed to help a bit, and scheduled a stress test for the following week.  Id.

On September 8, 2009, plaintiff presented to the emergency room complaining of left-side abdominal pain.  Tr. 360-68.  Plaintiff reported that the pain began the previous day.  Tr. 366.  Emergency room physician Dr. Michael A. Mauer, M.D., noted that the physical

13 - FINDINGS & RECOMMENDATION

examination was "difficult" because plaintiff was so uncomfortable.
Tr. 367. He reviewed the recent laboratory studies, finding nothing
remarkable. Id. He also ordered a contrast scan to rule out the
possibility of renal vein thrombosis or to shed light on other
causes of plaintiff's symptoms. Tr. 367, 385-88. The abdominal CT
scan returned no evidence for gross renal artery stenosis or renal
vein thrombosis. Tr. 385-88. Plaintiff was diagnosed with
abdominal pain, leukemia recurrence, controlled diabetes, and
elevated liver function, and discharged with instruction to follow-
up with Dr. Ward. Tr. 367.

Plaintiff returned to the emergency room three days later, on
September 11, 2009, for continued left-side abdominal pain. Tr.
351-59. Plaintiff reported that the pain had not changed since his
previous ER visit a week earlier. Tr. 358. An EKG returned normal
results, and the CT scan from the previous week was "unremarkable."
Tr. 354, 384, 385-86. While the precise etiology of the pain was
unclear, the emergency physician diagnosed plaintiff with abdominal
pain and constipation, but noted there was "no evidence of acute or
emergent condition to warrant further investigation," so plaintiff
was discharged. Tr. 359

Plaintiff underwent an abdominal ultrasound on September 18,
2009, to determine the cause of his ongoing abdominal pain, but the
results were "essentially negative . . . without any hydronephrosis
or a shadowing calculus." Tr. 371.

On September 28, 2009, Dr. Ward wrote a letter to plaintiff's
counsel, giving his opinion regarding plaintiff's ability to work.
Tr. 340. He noted that he did not think plaintiff could engage in
full-time work because he has multiple, chronic medical problems,

14 - FINDINGS & RECOMMENDATION

including diabetes, diabetic peripheral neuropathy, low back pain, hepatitis C, and possible cardiac issues.  Id.  He further opined that plaintiff would be limited in his ability walk, stand, and lift heavy objects, and would likely miss more than two days per month from work.  Id.

A CT scan of plaintiff's abdomen/pelvis taken on October 2, 2009, revealed fatty infiltration of the liver, moderate congenital spinal canal stenosis with early degenerative changes, cutaneous focus of skin thickening, but no gross findings of acute diverticulitis or abdominal or pelvic abscess formation.  Tr. 372, 375-76.  Follow-up imaging was recommended for retro peritoneal adenopathy because of possible infectious or inflammatory lymphoproliferative or neoplastic processes.  Id.

On October 6, 2009, plaintiff again reported to the emergency room complaining of constant left-side abdominal pain.  Tr. 344-50. The responding physician recalled seeing plaintiff a month earlier, noting that he has a "probable recurrence of lymphoma," based on the CT scan taken at that time.  Tr. 348.  Dr. Maurer diagnosed plaintiff with abdominal pain likely secondary to recurrence of leukemia with adenopathy.  Tr. 349.  He was discharged with a Vicodin prescription and instructions to follow-up with Dr. Ward in two days.  Id.

II. Plaintiff's Testimony

A.  Written Testimony

Plaintiff's written testimony primarily consists of a series of reports completed on May 22, 2008.  In a function report, plaintiff described a typical day as follows: he wakes up, eats breakfast, takes medication, watches television, helps take care of his kids

when he can, eats lunch, takes medication, takes a nap, and if he is feeling well, he will play a board game with his kids. Tr. 144. Once his wife comes home, he tries to help her with the kids while she makes dinner, he eats dinner, takes medication, watches television with the kids, and goes to bed. Tr. 144. With regard to his ability to help take care of his kids, he stated that he changes diapers, cooks sometimes, and generally keeps an eye on them. Tr. 145. However, he noted that other family members, namely his wife's relatives, do most of the caretaking, and he is just there if they need him. Id. He often wakes up in the middle of the night due to pain in his legs and feet. Id.

Plaintiff noted that he needs reminders to take his medication, does not prepare his own meals except for maybe a couple of times a month, and does not help much with household chores because he cannot be on his feet for long, and he often has difficulty getting out of bed. Tr. 145-47. He does not drive because he cannot see very well, so when he leaves the house, he does so by riding in a car or using public transportation. Tr. 147. He does the household shopping about once a month, taking about two hours. Id. He can go to the doctor's office on his own. Tr. 148. He can walk about a half-mile, but needs to rest for about an hour and a half before resuming. Tr. 149. He has difficulty lifting, squatting, bending, kneeling, climbing stairs, standing for too long, and has trouble with seeing, memory, and completing tasks. Id. He cannot follow written instructions because he cannot read or write. Id. Finally, plaintiff noted that he cannot easily handle stress or changes in routine, and he experiences anxiety. Tr. 150.

On the fatigue questionnaire completed the same day, plaintiff

16 - FINDINGS & RECOMMENDATION

noted that he first began experiencing fatigue "a couple of years ago," and that he takes one to two naps a day, lasting two to three hours. Tr. 152. He could stay active for approximately four to five hours, but that he tires easily, making it hard to stay awake and perform most daily activities. Id. He occasionally takes walks, but can only walk about a half-mile before needing to rest. Tr. 153. He can groom himself, but he never cleans the house or does laundry, and only shops or cooks about once a month. Tr. 153. His wife does most of the housework because he cannot be on his feet too long. Id. At night, he wakes up approximately every two to three hours to take pain medication, and some nights he does not sleep at all. Tr. 154. He can walk and stand for one hour before needing to rest, sit for three hours before needing to rest, occasionally bend and reach forward or upward, and can lift 10-15 pounds. Id. His medication causes him to feel sick, tired, irritated, and drowsy. Tr. 155.

On the pain questionnaire completed the same day, plaintiff noted that he experiences ongoing burning, shooting pains in his back, legs, feet, and kidneys that never goes away. Tr. 156. The pain is caused by everyday activities and is sometimes alleviated by resting. Id. He takes Vicodin, Soma, and ibuprofen for pain, but the medications make him nauseous, tired, and dizzy. Tr. 157. He can be active for about two hours before needing to rest, never takes walks, but if he does, he can only walk about a half-mile before needing to rest. Tr. 157-58.

In a disability report completed for appeal, plaintiff noted that as of August 1, 2008, he has infections in his liver and lungs, needs liver surgery, is experiencing strokes with loss of strength

17 - FINDINGS & RECOMMENDATION

1  in his left arm and leg, and has difficulty breathing.  Tr. 165.

2  Beginning September 1, 2008, he could no longer be left alone with

3  the children while his wife works because he loses consciousness and

4  is unable to get up after passing out.  Id.  Plaintiff noted that

5  he cannot read or write well enough to fill out paperwork, is having

6  strokes so cannot be left alone, cannot see his glucose meter

7  numbers to check his blood sugar, and cannot walk due to the pain in

8  his legs and feet.  Tr. 169.

9      B.  Hearing Testimony

10     Plaintiff testified at the hearing held on September 30, 2009.

11 Tr. 21-59.  At that time, plaintiff was seeing Dr. Ward for

12 hepatitis C, neuropathy in his legs, back pain, kidney problems,

13 diabetes, and migraines.  Tr. 33.  He testified that a typical day

14 consists of getting up in the morning, taking medication, trying to

15 eat, and laying back down for a few hours, and if he gets up again,

16 he'll go lay down on the couch.  Tr. 36-37.  On an average day, he

17 will lie down for approximately 10-12 hours.  Tr. 43.  He is

18 constantly hurting.  Tr. 37.  He does not use any ambulatory

19 assistance devices because he doesn't walk too far or climb stairs,

20 instead staying home and alternating between sitting up and laying

21 down.  Tr. 34.  He does not do the shopping because he cannot read

22 or stand for very long, he does not drive because he has poor

23 eyesight, and he does not help with household chores because he

24 experiences constant headaches and leg pain.  Tr. 35-36.  He can use

25 a telephone if it has big numbers on it, and he cannot use a

26 computer.  Tr. 35.  He does not socialize or leave the house much

27 because he doesn't feel good most of the time and he experiences

28 difficulty walking very far.  Tr. 36.

18 - FINDINGS & RECOMMENDATION

1    At the time of the hearing, plaintiff was taking Vicodin for
2 full-body pain, with the worst pain in his kidneys, head, and legs.
3 Tr. 37-38.  The only time he had treatment for his hepatitis C was
4 sometime in 2003, but he was unable to complete the whole program
5 because it made him very sick.  Tr. 38-39.  He was currently taking
6 insulin to try to keep his blood sugar controlled.  Tr. 40.  He
7 testified that he experiences severe elbow pain, daily headaches,
8 and wears glasses to see, but they make his headaches worse.  Tr.
9 40-41.  Other than the pain medication and lying down, nothing helps
10 alleviate his discomfort.  Tr. 42.

11    He stated that he last worked in 2007-2008 as a meat cutter,
12 and that he left that job because he was "getting sick all the time
13 and [he] was on [his] last sanction" because he missed so many days.
14 Tr. 29-30.  After leaving the job, he and his wife moved to Oregon
15 to be closer to her family "in case . . . we got our kids taken
16 away."  Tr. 30.  Plaintiff also related that he has six children who
17 were presently in the custody of the state because he was not being
18 a good father due to his illness.  Tr. 28.  He expected to get
19 custody back once he secured his own housing.  Id.  At that time, he
20 was living with his wife's grandmother.  Tr. 29.

21                    THE ALJ'S DECISION
22    The ALJ found that plaintiff met the insured status
23 requirements of the Social Security Act through December 31, 2009.
24 Tr. 12.  The ALJ found that plaintiff had not engaged in substantial
25 gainful activity since April 15, 2008.  Id.  He found that
26 plaintiff's Type II diabetes mellitus and diabetic neuropathy are
27 severe impairments.  Id.  The ALJ determined that plaintiff's
28 impairments did not meet or equal, either singly or in combination,

19 - FINDINGS & RECOMMENDATION

a listed impairment.  Tr. 14.

The ALJ determined that plaintiff has the RFC to perform light work except that he may not climb ladders, ramps, or scaffolds.  Id. He may frequently, as opposed to constantly, climb stairs and ramps, balance, stoop, kneel, crouch, and crawl.  Id.  Finally, he may not perform any work around hazards such as moving machinery.  Id.

In forming this RFC, the ALJ found plaintiff's testimony regarding the intensity, persistence, and limiting effects of his symptoms not fully credible.  Tr. 16.  The ALJ found plaintiff's wife's statement only partially credible because it "basically tracks the claimant's statements."  Id.  The ALJ also rejected the opinion of plaintiff's treating physician, Dr. Ward, who opined that plaintiff is not able to engage in full-time work due to his chronic medical problems.  Id.  The ALJ rejected this opinion because it was not supported by significant clinical abnormalities, and because it was not supported by his treatment notes.  Id.  Finally, the ALJ rejected Dr. Ward's opinion because Dr. Ward failed to relate plaintiff's walking, standing, and lifting limitations to plaintiff's specific impairments.  Id.

In rejecting plaintiff's account of the severity of his impairments, the ALJ noted that plaintiff's relatively conservative treatment history and the objective evidence do not support the severity of limitations alleged.  Id.  The ALJ further remarked that plaintiff's activities of daily living further undermine his credibility.  Id.

Based on this RFC, the ALJ determined that plaintiff could not perform his past relevant work, but that he could still perform jobs existing in significant numbers in the national economy.  Tr. 17-18.

20 - FINDINGS & RECOMMENDATION

Relying on the Medical-Vocational Guidelines and VE testimony, the ALJ found that plaintiff could perform the jobs of wood container partition assembler and small products packager, which exist in significant numbers in the economy. Tr. 18. Accordingly, the ALJ found plaintiff not disabled. Id.

## STANDARD OF REVIEW & SEQUENTIAL EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). Disability claims are evaluated according to a five-step procedure. Baxter v. Sullivan, 923 F.2d 1391, 1395 (9th Cir. 1991). The claimant bears the burden of proving disability. Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989). First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; see 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 141; see 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to

21 - FINDINGS & RECOMMENDATION

step four.  Yuckert, 482 U.S. at 141.

In step four the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant can, he is not disabled.  If he cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work.  Yuckert, 482 U.S. at 141-42; see 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets its burden and proves that the claimant is able to perform other work which exists in the national economy, he is not disabled.  20 C.F.R. §§ 404.1566, 416.966.

The court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Baxter, 923 F.2d at 1394.  Substantial evidence means "more than a mere scintilla," but "less than a preponderance."  Id.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Id.

DISCUSSION

Plaintiff asserts that the ALJ's decision should be reversed and remanded for an award of benefits because it is not supported by substantial evidence and contains errors of law.  In particular, plaintiff contends that the ALJ erred by failing to give clear and convincing reasons for rejecting his testimony, by improperly rejecting the opinion of plaintiff's treating physician, failing to include plaintiff's depression and hepatitis as severe impairments, failing to adequately develop the record regarding plaintiff's mental functioning, and by failing to satisfy his burden at step

1  five.

2  I.  Plaintiff's Credibility

3      Plaintiff argues that the ALJ erred by failing to give clear
4  and convincing reasons for rejecting his testimony regarding the
5  intensity, persistence, and limiting effects of his symptoms.  When
6  a claimant's medical record establishes the presence of a "medically
7  determinable impairment" that "could reasonably be expected to
8  produce the [claimant's alleged] pain or other symptoms," the ALJ
9  must evaluate the claimant's credibility in describing the extent of
10 those symptoms.  20 C.F.R. § 404.1529.  In the event the ALJ
11 determines that the claimant's report is not credible, such
12 determination must be made "with findings sufficiently specific to
13 permit the court to conclude that the ALJ did not arbitrarily
14 discredit claimant's testimony." Thomas v. Barnhart, 278 F.3d 947,
15 959 (9th Cir. 2002) (citing Bunnell v. Sullivan, 947 F.2d 341,
16 345-46 (9th Cir. 1991) (en banc)).  Unless the record has
17 affirmative evidence of malingering, the ALJ must offer specific,
18 clear and convincing reasons for rejecting the claimant's testimony
19 about the severity of his symptoms. Carmickle v. Comm'r, 533 F.3d
20 1155, 1160 (9th Cir. 2008).

21     When making a credibility evaluation, the ALJ may consider
22 objective medical evidence and the claimant's treatment history as
23 well as any unexplained failure to seek treatment or follow a
24 prescribed course of treatment.  Smolen v. Chater, 80 F.3d 1273,
25 1284 (9th Cir. 1996).  In weighing a claimant's credibility, the
26 ALJ may also consider the claimant's daily activities, work record,
27 and observations of physicians and third parties in a position to
28 have personal knowledge about the claimant's functional limitations.

1  Id.  In addition, the ALJ may rely on:

2        (1) ordinary techniques of credibility
      evaluation, such as the claimant's reputation
3        for lying, prior inconsistent statements
      concerning the symptoms, and other testimony by
4        the claimant that appears less than candid; (2)
      unexplained or inadequately explained failure to
5        seek treatment or to follow a prescribed course
      of treatment; and (3) the claimant's daily
6        activities.

7  Id.; see also SSR 96-7p; 1996 WL 374186 (July 2, 1996).

8       A finding that a claimant lacks credibility cannot be premised

9  solely on a lack of medical support for the severity of pain. See

10  Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995). However, a

11  credibility finding supported by substantial evidence in the record

12  cannot be disturbed. Thomas, 278 F.3d at 959 (citing Morgan v.

13  Comm'r, 169 F.3d 595, 600 (9th Cir. 1999)).

14       Here, the ALJ concluded that plaintiff's testimony concerning

15  the intensity, persistence, and limiting effects of his symptoms was

16  not entirely credible. Tr. 16. Since there is no evidence of

17  malingering, the ALJ was required provide clear and convincing

18  reasons to reject plaintiff's testimony regarding the severity of

19  his symptoms. In discrediting plaintiff's account of the severity

20  of his symptoms, the ALJ noted that plaintiff's daily activities,

21  conservative course of treatment, plaintiff's account of

22  debilitating pain and medication side effects, and other

23  inconsistencies in the record do not fully support his account of

24  his disabling symptoms. Tr. 16.

25       A. Activities of Daily Living

26       The ALJ pointed to several inconsistencies in plaintiff's

27  testimony regarding his activities of daily living that undermined

28  his credibility. First, the ALJ pointed out that plaintiff alleges

24 - FINDINGS & RECOMMENDATION

that he has difficulty using his legs and feet, yet he can walk up to a half-mile in distance, and up to 90 minutes without stopping to rest. Id. The record partially supports this observation. Plaintiff indeed noted that he could walk a half-mile in several reports but, as the Commissioner concedes, there is no indication in the record that he could walk for 90 minutes. Rather, in at least one report, plaintiff stated that he could walk a half-mile, but accompanied this statement with the limitation that after doing so, he would need to rest for 90 minutes before resuming walking. See Tr. 149. Plaintiff did state on his fatigue questionnaire that he can walk and stand for one hour before needing to rest, and on his pain questionnaire that he could be active for about two hours before needing to rest. Tr. 154, 157-58. As the Commissioner concedes, the record only reflects that plaintiff could walk a half-mile before needing to rest.

The ALJ also found plaintiff's credibility undermined by his activities of daily living because both plaintiff and his wife indicated that he occasionally shops, despite his testimony that he never shops. Tr. 16. The record fully supports this characterization, since plaintiff himself noted on several reports that he did the shopping about once a month, and that it takes him approximately two hours. See Tr. 147, 153. His wife's third party function report also corroborated this information. Tr. 139.

Finally, the ALJ found it significant that plaintiff helps care for his six children, doing some cooking, cleaning, and changing diapers. Tr. 16. This characterization has record support. Plaintiff did indicate on his May 22, 2008, function report that on a typical day he tries to help care with his children, by doing some

25 - FINDINGS & RECOMMENDATION

cooking, cleaning, and changing diapers. Tr. 144-45. However, on that same report, he also stated that the majority of the caregiving was provided by other family members, and that he provides support when he can. Tr. 145. At the time of the hearing, the children were in foster care and plaintiff and his wife were living with her family while she underwent rehab. Tr. 28-29. Plaintiff stated that his children were placed in foster care because he was not a good father due to his illness, but that it was his understanding that he would get them back in 30 days, once he had a house of his own. Id. Even though the ALJ did not include this change in family circumstances in his opinion, this change does not necessarily affect the ALJ's finding that when the children were in plaintiff's custody, he performed some caretaking functions. Plaintiff's own testimony was that he would get his children back as soon as he got a house of his own, leading to the reasonable inference that it was not necessarily his inability to care for them that necessitated their removal. Therefore, the ALJ's finding that plaintiff's credibility was undermined by his ability to care for his children is supported by the record.

B.  Conservative Course of Treatment

The ALJ found plaintiff's credibility was further undermined because the medical records reflect a conservative course of treatment and "show benign examinations and support more intermittent symptoms," than those alleged by plaintiff with regard to his ability to squat, bend, stand, kneel, and climb. Tr. 16. An ALJ may consider treatment as "an important indicator of the intensity and persistence of [claimant's] symptoms" 20 C.F.R. 416.929(c)(3). Specifically, the ALJ found it significant that

26 - FINDINGS & RECOMMENDATION

1  while the medical records show some parethesia and complaints of leg
2  pain, they do not reflect constant pain, weakness, or that
3  medication does not provide some relief. Id.

4      The record supports this characterization of the medical
5  evidence. In April 2008, in response to plaintiff's reported leg
6  pain and discoloration, physical examination revealed several
7  variscosities, enlarged veins, and some minor discoloration on
8  plaintiff's legs. Tr. 197. Microfilament testing revealed reduced
9  bilateral sensation on the bottom of his feet. Id. Despite these
10  results, the treatment notes indicate than none of these presented
11  any serious concerns. Id. Once he established care with Dr. Ward
12  in May 2008, plaintiff occasionally reported leg pain that felt like
13  "pins and needles," but most of the treatment notes indicated that
14  this lower extremity pain was effectively managed with pain
15  medication. See Tr. 236, 241, 266, 284, 303, 321, 404.

16      Moreover, at no time did Dr. Ward refer plaintiff for more
17  aggressive treatment to address the leg pain, lending further
18  support that the relatively conservative course of treatment with
19  pain medication was effective in controlling plaintiff's leg pain.
20  Notably, Dr. Ward did refer plaintiff to another physician to
21  conduct diagnostic testing, in an attempt to address plaintiff's
22  ongoing abdominal pain. See Tr. 326-32. Presumably, Dr. Ward would
23  have done the same for plaintiff's leg pain, if he felt that the
24  condition required it.

25      C.  Debilitating Symptoms

26      The ALJ further questioned plaintiff's credibility because the
27  record does not support plaintiff's account of debilitating pain,
28  fatigue, and irritability. Tr. 16. However, the record contains

27 - FINDINGS & RECOMMENDATION

numerous references to plaintiff's allegations of debilitating abdominal pain, for which plaintiff was referred to a specialist for further testing, and which caused plaintiff to present at the emergency room on several occasions. See Tr. 292-95, 326-32, 344-50, 351-59, 360-68, 371, 385-88, 413-14. The record also contains many treatment notes where plaintiff reported feeling tired, weak, irritable, or otherwise unwell, thereby supporting his characterization of the side effects of his medications. See Tr. 197-98, 234, 200, 241, 243, 294, 319, 412-13. However, given the conservative course of treatment discussed above, there is still ample support in the record for a reasonable person to conclude that while plaintiff was experiencing recurrent abdominal pain and medication side effects, his symptoms were not as severe as he alleged. Therefore, the record as a whole supports the ALJ's concern regarding of the severity of plaintiff's symptoms.

D.  Other Inconsistencies

Finally, the ALJ found that other inconsistencies in the record undermined plaintiff's credibility. Tr. 16-17. The ALJ noted that plaintiff alleges that he is losing his vision, but there are no medical records documenting vision problems. Tr. 16. The record supports this characterization, as the only medical records that even refer to vision problems are associated with headaches. See Tr. 241, 294.

The ALJ also relied on an April 2008 treatment note that suggests that plaintiff was still working, even though he alleged disability as of February 4, 2008, as a reason to not fully credit his testimony. Tr. 16. The treatment note referred to by the ALJ is dated April 7, 2008, which is several days before plaintiff's

28 - FINDINGS & RECOMMENDATION

onset date of April 15, 2008.  Tr. 197.  However, plaintiff alleged
an onset date of February 4, 2008, on his SSI application (Tr. 105).
He also alleged an onset date of April 15, 2008, on his disability
application (Tr. 112), which were filed at the same time.  While the
agency ultimately decided on April 15, 2008, as the onset date for
both applications, the fact that the ALJ pointed out that plaintiff
was still working after at least one alleged onset date is not an
error.  In fact, it is an astute observation.  The record reflects
that the agency ultimately decided on April 15, 2008, as the onset
date for both claims because that is the date that plaintiff stopped
working.  Tr. 131-35.  The ALJ's observation that plaintiff was
still working after his SSI alleged onset date is a legitimate
reason to undermine plaintiff's account of the severity of his
alleged impairments.

   E.  Conclusion

   I conclude that while not all the reasons given by the ALJ for
discrediting plaintiff's testimony were proper, his credibility
determination is supported by substantial evidence.  As discussed
above, the ALJ mischaracterized plaintiff's ability to ambulate and
his account of debilitating abdominal pain and medication side
effects.  Even though not every reason relied on by the ALJ to
discount a claimant's credibility is upheld on review, the
credibility determination will be sustained if the determination is
supported by substantial evidence.  Batson v. Comm'r Soc. Sec.
Admin., 359 F.3d 1190, 1197 (9th Cir. 2004).  Here, the ALJ's
reasoning reflects that he did not arbitrarily discount plaintiff's
assertions.  The ALJ considered proper factors such as plaintiff's
account of his activities of daily living, conservative course of

29 - FINDINGS & RECOMMENDATION

1  treatment, and other inconsistencies in the record.  The ALJ drew

2  logical inferences supported by a rational interpretation of

3  substantial evidence in the record.    While hardly the only

4  interpretation of the evidence, the ALJ's reasoning is clear and

5  convincing.  Consequently, reversal or remand on this issue is not

6  warranted.

7  II.  Rejection of Treating Physician's Opinion

8       Plaintiff contends that the ALJ improperly rejected the opinion

9  of his treating physician.  Social security law recognizes three

10 types of physicians: (1) treating; (2) examining; and (3)

11 nonexamining.  Lester, 81 F.3d at 830.  Generally, more weight is

12 given to the opinion of a treating physician than to the opinion of

13 those who do not actually treat the claimant.  Id.

14      If the treating physician's opinion is not contradicted, the

15 ALJ may reject it only for "clear and convincing" reasons.  Id.

16 Even if the treating physician's opinion is contradicted by another

17 doctor, the ALJ may not reject the treating physician's opinion

18 without providing "specific and legitimate reasons" which are

19 supported by substantial evidence in the record.  Id.

20      The ALJ rejected the opinion of Dr. Ward that plaintiff is

21 unable to engage in full-time work due to his chronic medical

22 problems.  Tr. 16.  His opinion is contradicted by Dr. Berner, a

23 state agency physician. See Tr. 268-75.  Thus, the ALJ must provide

24 specific and legitimate reasons supported by substantial evidence

25 to reject Dr. Ward's opinion.

26      The ALJ gave several reasons for his rejection of Dr. Ward's

27 opinion that plaintiff is unable to engage in full-time work.

28 First, the ALJ rejected Dr. Ward's opinion because his statement

30 - FINDINGS & RECOMMENDATION

constitutes a conclusion on the ultimate issue of disability, which is an issue reserved to the Commissioner. Tr. 16. It is well established that a "treating physician's evaluation of a patient's ability to work may be useful," but "the law reserves the disability determination to the Commissioner." McLeod v. Astrue, 634 F.3d 516, 520 (9th Cir. 2011) (citing 20 C.F.R. § 404.1527(e)(1)).

The ALJ also rejected Dr. Ward's opinion that plaintiff would need to miss work more than two days per month because it was not supported by findings in his treatment summaries. Tr. 16. An ALJ may properly discount a physician's opinion based upon discrepancies between the opinion and the physician's treatment notes. Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005). Dr. Ward's treatment notes indicate that he was plaintiff's primary treating physician for nearly all of the relevant period, beginning in May 2008. Tr. 241. Dr. Ward saw plaintiff on a regular basis, treating him for all manner of issues, including diabetes, depression, neuropathy, headaches, abdominal pain, pneumonia, and general aches, pains, and overall discomfort. See Tr. 226-53, 282-304, 313-427. While Dr. Ward's treatment notes form the bulk of the medical record, his summaries are largely devoid of any observations regarding plaintiff's functioning. Rather, most all of Dr. Ward's treatment notes follow the same formula: they begin with plaintiff's subjective account of his symptoms, move to Dr. Ward's recitation of plaintiff's vital signs and physical examination notes and observations, and conclude with Dr. Ward's "impression and recommendations" regarding plaintiff's various complaints. At no time does Dr. Ward make any observations that might support his opinion that plaintiff would miss two or more days of work per

31 - FINDINGS & RECOMMENDATION

month.  His treatment notes do not include references that plaintiff has difficulty completing tasks, misses appointments, or otherwise exhibits signs that he would have problems consistently reporting for work.  His notes do not even include any information that corroborates plaintiff's account of the severity of his symptoms, such as that he cannot perform household chores and spends most of his time laying down or sleeping.  There is nothing in Dr. Ward's treatment summaries to indicate that he had any reason to believe that plaintiff would miss two days of work per month, other than that he suffers from various ongoing impairments.

Finally, the ALJ rejected Dr. Ward's opinion that plaintiff would have walking, standing, and lifting limitations because he did not explain what those limitations are or how they specifically relate to plaintiff's impairments. Tr. 16.  Plaintiff asserts that the ALJ should have recontacted Dr. Ward for further explanation, if he believed that this conclusion was inadequate.  However, as discussed below, an ALJ is required to recontact a doctor only if the doctor's report is ambiguous or insufficient for the ALJ to make a disability determination.  Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001).  Here, the ALJ did not find the record ambiguous, rather, he declined to give controlling weight to Dr. Ward's opinion because it failed to explain plaintiff's limitations and was therefore incomplete.  Ultimately, the ALJ found that the record demonstrated that plaintiff indeed has some exertional and postural limitations, and he incorporated those limitations into plaintiff's RFC.  It was well within the ALJ's province to note that he found Dr. Ward's opinion deficient because it was incomplete.

The ALJ cited specific and legitimate reasons to not fully

32 - FINDINGS & RECOMMENDATION

1  accept  Dr.  Ward's  contradicted  opinion  regarding  plaintiff's

2  disability.   Substantial  evidence  in  the  record  supports  those

3  reasons. Thus, reversal or remand on this issue is not warranted.

4  III.   Severe Impairments

5       Plaintiff asserts that the ALJ erred by failing to include his

6  depression  and  hepatitis  C  as  "severe"  impairments  at  step  two  of

7  the  sequential  analysis,  and  that  he  further  erred  by  failing  to

8  include  any  limitations  related  to  these  impairments  in  plaintiff's

9  RFC.

10      The ALJ considers the severity of the claimant's impairment(s)

11 at step two.   20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

12 If  the  claimant  does  not  have  a  severe,  medically  determinable

13 physical  or  mental  impairment  that  meets  the  duration  requirement,

14 or  a  combination  of  impairments  that  is  severe  and  meets  the

15 duration requirement, the claimant is not disabled.   Id.

16      A  severe  impairment  is  one  that  significantly  limits  the

17 claimant's physical or mental ability to do basic work activities.

18 20 C.F.R. §§ 404.1520(c), 416.920(c).   "Basic work activities" are

19 the  abilities  and  aptitudes  necessary  to  do  most  jobs,  including

20 physical functions such as walking, standing, sitting, lifting, etc.

21 20 C.F.R. §§ 404.1521(b), 416.921(b).   In  Social  Security  Ruling

22 (SSR) 96-3p (available at 1996 WL 374181, at *1), the Commissioner

23 has explained that "an impairment(s) that is 'not severe' must be

24 a slight abnormality (or a combination of slight abnormalities) that

25 has no more than a minimal effect on the ability to do basic work

26 activities."

27      The Ninth Circuit has explained that the step two severity

28 determination is expressed "in terms of what is 'not severe.'"

33 - FINDINGS & RECOMMENDATION

1  Smolen, 80 F.3d at 1290.   The ALJ is required to consider the
2  claimant's  subjective  symptoms,  such  as  pain  or  fatigue,  in
3  determining severity.  Id.  Importantly, as the Ninth Circuit noted,
4  "the step-two inquiry is a de minimis screening device to dispose
5  of groundless claims."  Id. (citing Yuckert, 482 U.S. at 153-54).

6      "[T]he severity regulation is to do no more than allow the
7  [Social Security Administration] to deny benefits summarily to those
8  applicants with impairments of a minimal nature which could never
9  prevent a person from working."  SSR 85-28 (available at 1985 WL
10  56856, at *2) (internal quotation omitted).  Therefore, "an ALJ may
11  find  that  a  claimant  lacks  a  medically  severe  impairment  or
12  combination of impairments only when his conclusion is 'clearly
13  established by medical evidence.'"  Webb v. Barnhart, 433 F.3d 683,
14  687 (9th Cir. 2005) (quoting SSR 85-28).  The court's task in
15  reviewing a denial of benefits at step two is to "determine whether
16  the ALJ had substantial evidence to find that the medical evidence
17  clearly established that [the claimant] did not have a medically
18  severe impairment or combination of impairments."  Id.

19      At step two, the ALJ found that plaintiff has the combined
20  severe impairments of diabetes and diabetic neuropathy.  Tr. 12.
21  In so finding, the ALJ determined that plaintiff's depression and
22  hepatitis, among other impairments, were not severe impairments
23  because they do not have more than a minimal effect on his ability
24  to perform work-related activities.  Id.

25      It is well-documented that plaintiff suffers from an ongoing,
26  active hepatitis C infection.  However, it is also well-documented
27  that during the relevant period, plaintiff never received any
28  treatment for this condition, other than occasional liver function

34 - FINDINGS & RECOMMENDATION

tests and blood work.  <u>See</u> Tr. 200, 240, 244.   The court notes that

at the hearing, plaintiff stated that he began hepatitis C treatment

in 2003, but that it made him sick so his physicians discontinued

treatment after eight months.  Tr. 39.  In August 2006, plaintiff

reported to an emergency room physician that he had started

treatment for hepatitis C, but could not finish because of

inadequate funding.  Tr. 191.  There is no further record support

for either of these assertions, and neither falls within the

relevant disability period.

     Plaintiff's primary treating physician during the relevant

period, Dr. Ward, often made note of plaintiff's hepatitis C, but

never pursued treatment.  On June 12, 2008, Dr. Ward noted that

other health issues needed to be taken care of before pursuing

hepatitis treatment.  Tr. 240.  A few months later, on August 7,

2008, Dr. Ward recommended that plaintiff "establish with mental

health," in anticipation of beginning hepatitis C treatment.  Tr.

231-32.  There is no evidence that plaintiff ever actually began

treatment.  Most importantly, there is not a single record that

establishes that plaintiff has any work-related limitations

whatsoever that could be attributed to his hepatitis C infection.

Therefore, the record supports the ALJ's conclusion that plaintiff's

hepatitis C, while an ongoing medical issue, did not impose more

than a slight limitation on plaintiff's functioning, and therefore,

is not a severe impairment.

     With regard to plaintiff's depression, the ALJ concluded that

it did not cause more than minimal limitation on plaintiff's ability

to perform work-related activities, in part because the record

establishes that by the end of 2008, it was well-controlled with

35 - FINDINGS & RECOMMENDATION

antidepressant medication.  Tr. 13.  The record fully supports this characterization.  When plaintiff established care with Dr. Ward on May 27, 2008, he reported his history of depression and told Dr. Ward that while he was still experiencing symptoms, he was "overall pleased" with Prozac, which he had begun in February 2008.  Tr. 200, 241.  During this initial visit, Dr. Ward  increased plaintiff's Prozac dosage because while the current dose was helpful, there was "more room to go to help with his ongoing depressive symptoms."  Tr. 244.  During the next several visits, Dr. Ward's treatment notes document changes made to plaintiff's mental health medications.  See Tr. 234-36, 239-40.  By August 7, 2008, plaintiff was reporting improved mood.  Tr. 231-32.  Thereafter, Dr. Ward's treatment notes include only scattered notations regarding plaintiff's mental health, consisting primarily of medication adjustments.  See Tr. 243, 423.  Dr. Ward frequently observed that plaintiff was disheveled, had a flat affect, and seemed "somewhat depressed," but did not otherwise document anything other than mild psychological impairments.  Id.  None of Dr. Ward's treatment notes indicate that plaintiff has any work-related limitations related to depression. Therefore, the ALJ did not err in concluding that plaintiff's depression was not a severe impairment.

Even assuming the ALJ should have considered plaintiff's hepatitis C and depression severe impairments, the ALJ found in favor of plaintiff at step two, permitting the claim to go forward to further steps of the sequential disability analysis.  Thus, any error in failing to consider certain impairments as severe was harmless.  See Burch v. Barnhart, 400 F.3d 676, 682 (9th Cir. 2005) (any error in omitting an impairment from the severe impairments

identified at step two was harmless where step two was resolved in claimant's favor).  Thus, reversal or remand on this basis is not warranted.

To the extent that plaintiff asserts that the ALJ should have included limitations related to his hepatitis C and depression in plaintiff's RFC, this argument is without merit.  A reviewing court "will affirm the ALJ's determination of [the claimant's] RFC if the ALJ applied the proper legal standard and the decision is supported by substantial evidence."  Bayliss, 427 F.3d at 1217.  An ALJ is not required to perform such an analysis for medical conditions for which the ALJ found neither credible, nor supported by the record.  Id.  Since the ALJ did not find any evidence of functional limitations caused by plaintiff's hepatitis C and depression, he did not err by failing to include them in plaintiff's RFC.

IV.  Duty to Develop the Record

Plaintiff  argues that the ALJ failed to satisfy his duty to fully develop the record by failing to order a psychological evaluation on the basis of plaintiff's allegation that he is unable to read or write.  It is well established that an ALJ has a "special duty to develop the record fully and fairly and to ensure that the claimant's interests are considered, even when the claimant is represented by counsel."  Mayes, 276 F.3d at 459 (citing Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001); Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)).

However, the ALJ's duty to further develop the record is "triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."  Id., 276 F.3d at 459-460; see also Smolen, 80 F.3d at 1288 (ALJ erred by

37 - FINDINGS & RECOMMENDATION

rejecting physician opinion for lack of foundation instead of further developing the record so he could properly evaluate the opinions).   It is within the ALJ's discretion to determine if the record is vague and ambiguous, thereby warranting further development. See 20 C.F.R. § 404.1512(e); Mayes, 276 F.3d at 459-60. The ALJ may "discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." Tonapetyan, 242 F.3d at 1150.

Here, the ALJ's duty to further develop the record was not triggered.   Plaintiff does not argue that the record before the ALJ was ambiguous or otherwise inadequate to allow for a proper evaluation of the evidence.   Instead, plaintiff argues that his alleged inability to read or write suggested a learning disorder, which combined with plaintiff's depression, indicates that he suffers from "cognitive and emotional disorders affecting his ability to work."  Pl's Reply (#13), p. 10.  However, plaintiff does not elaborate on why these two conditions necessarily trigger the ALJ's duty to further develop the record.

As discussed above, the ALJ did not consider plaintiff's depression a severe impairment because the record demonstrated that it was well controlled with medication.  Tr. 13.   The ALJ also considered and rejected plaintiff's claim that his inability to read or write affected his ability to perform work-related functions because he had previously worked as a meat cutter apprentice and diesel mechanic, which are skilled professions that require at least some degree of literacy.   Tr. 17.   The ALJ discussed both

plaintiff's alleged depression and his alleged illiteracy in some detail, suggesting that the record was indeed fully developed regarding both impairments.  There is nothing to indicate that the ALJ should have considered these impairments together, in terms of whether plaintiff suffers from a cognitive or emotional disorder that impacts his ability to perform work related functions, as is now suggested by counsel.

Moreover, neither plaintiff, nor his counsel, ever requested an additional examination during the hearing or at any time prior to the ALJ's decision, despite the fact that the ALJ did leave the record open for plaintiff's counsel to submit additional documentation regarding other issues, in light of plaintiff's hearing testimony.  Tr. 44-45, 58.  Nor does he now make the argument that any of the medical evidence was ambiguous or otherwise inadequate.  Instead, it seems that plaintiff seems to be asserting that the ALJ should have independently decided that plaintiff should undergo a comprehensive psychological examination based solely on the fact that plaintiff allegedly cannot read or write and has some depression issues.  This generalized assertion is not enough to establish that the ALJ failed to satisfy his duty to fully and fairly develop the record.

Accordingly, remand or reversal on this basis is unwarranted.

V.  Step Five

Plaintiff challenges the ALJ's step five finding on the basis that the hypothetical posed to the VE did not include all of his limitations.  At step five, the Commissioner must show that there are a significant number of jobs in the national economy that the claimant can perform, given his RFC.  <u>Tackett v. Apfel</u>, 180 F.3d

39 - FINDINGS & RECOMMENDATION

1  1094, 1100-01 (9th Cir. 1999); Andrews v. Shalala, 53 F.3d 1035,

2  1043 (9th Cir. 1995).  The Commissioner can satisfy this burden by

3  eliciting the testimony of a VE regarding what jobs the claimant

4  would be able to perform, given his or her RFC.  Id.  An ALJ must

5  propose a hypothetical that sets forth all the reliable limitations

6  and restrictions of a claimant that are supported by substantial

7  evidence.  Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).

8  The hypothetical must be "accurate, detailed, and supported by the

9  medical record."  Tackett, 180 F.3d at 1101.  "If a hypothetical

10 fails to reflect each of the claimant's limitations supported by

11 'substantial evidence,' the expert's answer has no evidentiary

12 value."  Osenbrock v. Apfel, 240 F.3d 1157, 1167 (9th Cir. 2001)

13 (citing Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984)).

14      At the hearing on September 30, 2009, the ALJ posed two

15 hypotheticals to the VE in order to solicit testimony regarding what

16 jobs plaintiff could perform given his RFC.  Tr. 54-56.  In the

17 first hypothetical, the ALJ asked the VE to consider an individual

18 that is capable of light work and who can climb stairs or ramps, but

19 cannot climb ladders or scaffolds.  Tr. 54.  Additionally, the

20 individual can balance, stoop, kneel, crouch, and crawl.  Id.

21 Finally, the ALJ asked the VE to assume that the individual has no

22 manipulative limitations, but that because of possible sensory loss

23 in the feet, the individual should not be in a work environment that

24 has hazards.  Id.  In response, the VE testified that such an

25 individual could not perform any of plaintiff's past work of general

26 laborer, janitor, or meat cutter, because all of these jobs require

27 more than light exertional level work.  Tr. 55.  However, the VE

28 testified that such an individual could work as a wood container

40 - FINDINGS & RECOMMENDATION

partition assembler, small products packager, and as a bench worker, because these positions are light work and have a predictable work area with no hazards. Id. The ALJ then proposed a second hypothetical, adding that the individual would be likely to miss more than two days a month from work because of chronic medical conditions. Tr. 56. The VE responded that such a pattern would be considered excessive absence, and such an individual would likely be deemed non-reliable, resulting in a warning and possible termination. Id.

Relying on this testimony as well as the Medical-Vocational Guidelines and Dictionary of Occupational Titles (DOT), the ALJ found that plaintiff could perform jobs existing in significant numbers in the national economy. Tr. 17-18. In so finding, the ALJ noted that he found "additional postural limitations" that were not fully reflected in the hypothetical presented to the VE, but that he confirmed with the DOT that plaintiff could actually perform those jobs identified by the VE, given his RFC. Tr. 18. The DOT is routinely relied on "in determining the skill level of a claimant's past work, and in evaluating whether the claimant is able to perform other work in the national economy." Terry v. Sullivan, 903 F.2d 1273, 1276 (9th Cir.1990). It classifies jobs by their exertional and skill requirements, and is a primary source of reliable job information for the Commissioner. 20 C.F.R. § 404.1566(d)(1).

While not entirely clear, the "additional postural limitations" referred to by the ALJ are most likely regarding plaintiff's ability to balance, stoop, kneel, crouch and crawl. The hypothetical placed no limitation on these movements, but the RFC noted that plaintiff

41 - FINDINGS & RECOMMENDATION

"may frequently - as opposed to constantly" perform these activities. <u>Compare</u> Tr. 54 with Tr. 14. Thus, it seems that in formulating plaintiff's RFC, the ALJ intended to place some limitation on plaintiff's ability to perform these movements, which was not necessarily reflected in the hypothetical presented to the VE. However, this deviation is harmless because the DOT indeed confirms that two of the jobs identified by the VE can be performed by an individual who can frequently balance, stoop, kneel, crouch, and crawl. <u>See</u> DOT 762.687-054, 920.685-026; United States Department of Labor, DOT (0 ed. 1991), available at http://www.occupationalinfo.org.

Plaintiff's challenges to the ALJ's conclusion at step five cannot be sustained. The ALJ elicited testimony from the VE based largely on the RFC assessment, and where the RFC deviated from the hypothetical posed to the VE, the ALJ properly consulted the DOT to confirm that plaintiff could actually perform the jobs. <u>See</u> <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1435 (9th Cir. 1995) (noting that the best source of how a job is actually performed is the DOT). The ALJ considered all the evidence and framed his vocational hypothetical based upon the limitations supported by the record as a whole, taking into account plaintiff's limitations and restrictions supported by substantial evidence. He was not required to incorporate additional limitations he found unsupported by the record. <u>Osenbrock</u>,240 F.3d at 1163-65. Consequently, reversal or remand is not warranted on this basis.

CONCLUSION

The Commissioner's decision should be affirmed.

/ / /

1        SCHEDULING ORDER

2        The Findings and Recommendation will be referred to a district

3    judge.  Objections, if any, are due July 19, 2011.  If no objections

4    are filed, then the Findings and Recommendation will go under

5    advisement on that date.

6        If objections are filed, then a response is due August 5, 2011.

7    When the response is due or filed, whichever date is earlier, the

8    Findings and Recommendation will go under advisement.

9        IT IS SO ORDERED.

10                    Dated this 1st day of July, 2011.

11

12                                 /s/ Dennis J. Hubel

13                                 _____

14                                 Dennis James Hubel
                                   United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

43 - FINDINGS & RECOMMENDATION